IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 24, 2013

**ANITA KAY BROUGHTON v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Claiborne County**
**No. 13CC1-2010-CR-579       E. Shayne Sexton, Judge**

---

**No. E2013-00790-CCA-R3-PC - Filed November 27, 2013**

---

The petitioner, Anita Kay Broughton, appeals the denial of her petition for post-conviction relief. The petitioner was convicted of first degree premeditated murder and received a sentence of life with the possibility of parole. On appeal, she contends that she received ineffective assistance of counsel at trial. Specifically, she contends that trial counsel was ineffective by failing to pursue a defense of diminished capacity despite ample proof that the petitioner suffered from a mental condition. She also challenges the accuracy of the post-conviction court's order denying relief. Following review of the record, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Thomas J. Tabor, Jr., Tazewell, Tennessee, for the appellant, Anita Kay Broughton.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Lori Phillips-Jones, District Attorney General; and Amanda Hathcock Sammons, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Procedural History**

The petitioner's conviction in this case is based upon her actions in killing her boyfriend, Rick Ellison. She was indicted by a Claiborne County grand jury for one count of first degree premeditated murder and convicted as charged by a jury. This court, on direct appeal, recited the following facts. Although quiet voluminous, we include this recitation

within this opinion, as the facts are necessary for a proper review of the issues raised in this opinion. The direct appeal opinion states:

This case arises from a stabbing death that occurred on December 21, 2005. . . . At trial, the following evidence was presented: Melvina Suttles, a friend of the [petitioner] and Linda Robertson, testified that on December 21, 2005, the [petitioner] invited her "to party . . . for a little while" at the trailer home the [petitioner] shared with Rick Ellison, the victim. Suttles reported that they drank and did drugs in the living room. Suttles then said, "And that's pretty much the last thing I remember, sitting on the sofa in her living room. And when I came to, I was naked in their bedroom." She said she was awakened by someone fondling her. At that point, she "went ballistic . . . and tried to leave." Suttles testified the [petitioner] became angry when Suttles tried to leave, and, subsequently, the [petitioner] and the victim began arguing. Suttles said, "The [petitioner] told me I did not have to leave and she didn't want me to leave, and [the victim] told the [petitioner] just to leave me alone and let me go." S[u]ttles testified that the [petitioner] then stabbed the victim multiple times with a knife with a four- to six-inch blade. Suttles said she did not see a hammer or a screwdriver. The victim pushed the [petitioner] away from himself, and then the [petitioner] pushed Suttles into the hallway. Suttles, who was still naked, ran to Robertson's house and told Robertson to call 9-1-1.

Suttles stated that she did not see the victim stab the [petitioner]. She also had never witnessed the victim assault, threaten, or "pull a weapon on" the [petitioner]. She did not remember anyone touching the curtains in the bedroom. Suttles said the [petitioner] referred to the victim as "Nigger," but she thought it might have been his nickname. Suttles recounted that the [petitioner] "was always saying things about [the victim], like she -- she needed to get rid of him or get away from him or something like that." Suttles acknowledged that she originally told the police she was not in the back bedroom when the stabbing took place. Referring to the stabbing, Suttles stated the [petitioner] stabbed the victim two to three times, even while he was "trying to turn away from her . . . ." Suttles admitted to being under the influence of alcohol, marijuana, and xanax on the night of December 21, 2005, and she had a cut on her finger but did not know how it happened.

Suttles said that, when she ran to Robertson's door, Robertson let her in and washed the blood off of Suttles's face and hands. Robertson gave Suttles some clothes to wear. Then, the [petitioner] "just stomped on the door

-2-

and came through the door" wanting "someone to help haul the body away." Robertson told the [petitioner] she would not help, and then Robertson called 9-1-1. Suttles said the [petitioner] then tried to run away, but Suttles "tackled her and brought her back in the house." Suttles recalled that the [petitioner's] hair, shirt, and shoelaces were covered in blood.

On cross-examination, Suttles said she, Robertson, and the [petitioner] went Christmas shopping in Tazewell and Middlesboro the day of the killing. They went to the Walmart and the Dollar Store, but they did not buy anything. Suttles did not remember stopping at a bar, but she thought it was "probable" that they stopped at a pharmacy. Suttles explained that any inconsistencies between her previous statements to the police and her testimony was because she was under the influence of drugs when she talked to the police. She did not remember how many xanax she took the day of the killing.

Suttles said that she remembered the [petitioner] and victim "talking and stuff and walking back and forth through the house." They then "shoved[d] each other back and forth." Suttles also said she did not remember taking off her clothes in the bedroom at the [petitioner's] trailer; she believed that someone took her clothes off against her will. Suttles denied ever having sexual relations with the [petitioner], and she did not remember a sex toy being in the bed. Suttles said that the [petitioner] had a knife with her in the bedroom.

Linda Robertson, the [petitioner's] neighbor, testified that she had known the [the petitioner] for five to seven years and had known the victim for sixteen to eighteen years. The victim lived with the [the petitioner] in the trailer below Robertson. Robertson said the victim worked on cars and was in construction; the [petitioner] did not work.

Robertson said she was asleep on her couch on December 21, 2005, when she was awakened by someone knocking on her door and yelling for help. She opened her door and saw Suttles standing there naked with blood smeared on her hands and face. Suttles told Robertson that the [petitioner] was stabbing the victim. Robertson washed Suttles and put clean clothes on her. Ten to fifteen minutes later, the [petitioner] "fell through the door." Talking about the [petitioner], Robertson said, "She was covered in blood and she fell on the floor, and she said, 'He's dead. You've gotta help me get rid of the body.'" Robertson said that the [petitioner] was not calm. While Robertson called 9-1-1, the [petitioner] left the house. Robertson stated that the

[petitioner] did not want the paramedics there because she did not want to be arrested for being drunk. Robertson had heard the [petitioner] previously say "she could kill anybody and get away with it." The [petitioner] explained that "she dr[ew] a crazy check and she might pull six or eight months in a crazy house and that would be it." Robertson said the [petitioner] always carried a knife that had a five- to six-inch blade that folded into the handle.

Speaking of the [petitioner] and the victim's relationship, Robertson said, "They got along, I thought great." She did not know of the victim ever striking or threatening the [petitioner]. She acknowledged that the couple fought "but within five or ten minutes, everything was fine." Robertson did say that the victim became "argumentative" when he drank.

On cross-examination, Robertson said that she, Suttles, and the [petitioner] went Christmas shopping earlier in the day. While out, they stopped at a bar to see Robertson's friend, but he was not at the bar. That night, when Suttles came to her home, Robertson washed the blood off Suttles with a rag. Robertson described the [petitioner's] demeanor as "scared," which, Robertson said, was how the [petitioner] "always acted."

Special Agent James Whitson with the TBI testified that he investigated the crime scene. He stated that there were three scenes: (1) the [petitioner's] home where the body was stabbed; (2) the van that was parked between the [petitioner's] and Robertson's homes; and (3) Robertson's home, where Suttles and the [petitioner] went after the stabbing. Agent Whitson stated that there was blood in the van on the driver's seat and on the arm of the passenger seat. Agent Whitson spoke with the [petitioner], who was not handcuffed, at the hospital, and she consented to a search of her house and to give a blood sample. Agent Whitson also took the [petitioner's] clothes as evidence. The [petitioner] then went with Agent Whitson to the Criminal Investigation Division ("CID") of the Sheriff's Department, where she waived her Miranda rights and gave a statement. Agent Whitson read that statement into evidence:

> This is a statement of [the petitioner] given to TBI Agent James Whitson in Claiborne County and Detective Rick Davis on . . . 12-22-05 at the Claiborne County CID office.

> On 12-21-05, Melvina Suttles, Linda [Robertson] and I went out partying. We started out at Sam Owens'[s] store. Linda drove Melvina and I . . . around. We were drinking liquor

-4-

and beer.  Melvina and I started kissing each other.  It made Linda a little mad.  Just after dark, Linda stopped at the Straight Branch Bar.  Linda went in and saw her boyfriend, Timothy Howard.  While Linda was in the bar, Melvina and I continued to kiss and make out.  Linda was inside about 15 minutes.  When Linda came out, she took me and Melvina to my house at 351 Boone Hollow Road in Speedwell.

When Melvina and I got out of the car, Melvina asked me if my boyfriend, Rick Ellison, would like to have a threesome.  Rick lives with me at my house, and Rick had been talking about having sex with two women.  I told Melvina we would find out if he wanted to or not.  We went in -- we went in the trailer.  Rick was sitting on the love seat by the door.  Melvina and I asked Rick if he wanted to have a threesome.  I believe he thought we were kidding -- I believe we -- he thought we were joking.  Melvina and I started kissing again and making out.  We started toward the back bedroom, and Rick said, "Well, why the hell not."  He followed us to the bedroom.

Melvina and I got to the bedroom and we took off our clothes.  Rick came in the room and watched us make out.  Rick watched Melvina and me have sex for a little while.  Then he left and went and took a shower.  Melvina and I continued in the bedroom.  Rick come out of the shower and joined us.  We were all three having sex together.  Melvina and I got a vibrator out and started using it on each other.  During all the flopping around, we tore down the curtain in the bedroom.  Rick was sitting on the bed with his head in his hands.  Rick was drinking something.

I didn't want the neighbors to see us all having sex, so I got out a little screwdriver and hammer to put up the curtain -- to put the curtain back up.  Rick started cussing saying things like, "I'm over this shit."  He told me that he didn't want me fucking anyone else.  I don't know when Rick went to the kitchen and took a silver knife.  Melvina and I had our back to the bed putting up the curtains when all of a sudden Rick started slicing me on the back of my right lower leg.  I turned around and tried to stop him, and he stabbed me in my right hand.  He

also sliced me on my upper right leg. There may be some marks on my left leg.

Melvina saw Rick cutting me, and she hit him with the hammer. It all happened so fast that . . . I don't know how many times Melvina hit Rick. I believe she was trying to get Rick to stop cutting me.

There was blood everywhere. I don't remember anyone saying anything. After Melvina stopped hitting Rick, she ran out of the room naked. I believe she ran all the way to Linda [Robertson's] house naked.

Linda [Robertson] lives just up the road a little ways. After Melvina ran out, I grabbed Rick by the shoulder and shook him. He wasn't moving. I thought that he was dead. I grabbed some clothes and put them on and jumped in Rick's van and tried to drive to Linda's house. The van stopped and wouldn't go anymore, so I jumped out and ran up to Linda's. When I went in, Melvina was in the floor flopping around and I fell onto the floor. I told Linda that I thought Rick was dead. Linda called 911. I don't know what she said to them. A few minutes later, everyone started arriving, and I was taken to the Claiborne County Hospital.

Agent Whitson testified that the [petitioner] was free to leave at any time while she was at the Criminal Investigation Division ("CID") and that he did not plan to charge her. He said the [petitioner] stayed awhile longer, and she then gave a second statement, which Agent Whitson also read into evidence:

This is the second statement given to TBI Agent James Whitson and Detective Harrison Cornett at the CID office on 12-22-05 at 6:35 a.m., by [the petitioner].

I remembered a few more details concerning Ricky Ellison's death. When Ricky started cutting me, I remember we fought for a few minutes. I grabbed the small screwdriver that we were putting the curtain up with. I stabbed Ricky at least one time. I can't remember if I stabbed him any more or not. I'm

-6-

having a flash of memory that I might have stabbed him more than that one time.

I remember Sissy, who is Melvina, threw the hammer that we were working with and hit Rick with it. Sissy ran out of the house naked screaming. I grabbed the hammer and hit Rick three or four more times. I told Rick, "You won't hurt me anymore." Then I noticed Rick wasn't moving. I didn't mean to kill Rick, it just happened. I grabbed his shoulder and tried to shake him, but he didn't move.

My hand was still bleeding so I went to the bathroom to get a towel. I wrapped my hand up. I noticed blood in the floor and I tried to clean up -- I tried to clean the floor up.

I was so scared, I ran out of the house and jumped into Rick's van. I drove it a little ways toward Linda's house and then stopped. I ran to Linda's and fell through the door. I saw Sissy in the floor, and I told them I thought Rick was dead. I told Linda I thought I had stabbed Rick. I told her to call 911.

All the other stuff in the first statement is true except for where I left out the part where I stabbed and hit Rick with the hammer.

I went to Dr. Day's office last month and saw Dr. Teresa. She told me I needed to go back on -- she told me I needed to go back to Cherokee Mental Health. She thought I needed to be taking all my medication. I quit taking it back around 2003. The pills were for my blackout spells. Sometimes I black out and don't remember what happened.

Back in 2003, I was ordered by Campbell County Court to be - to go to Cherokee Mental Health. Cherokee Mental Health gave me medication, but I stopped taking it. I thought I would be all right without it. Even though the doctor told me to go back last month, I didn't.

Back around September of 2005, after Rick got out of jail, we had been living together about a month. Rick choked

me until I passed out. He woke me up and told me that he wanted to kill me because I had been with someone else while he was in jail.

A few weeks ago we were at my house with Aubrey Drummonds. Aubrey's daughter Rhonda was there. Rick asked her to suck his dick, and I told him not to do that. Rick jumped up and said, "If you ever talk to me that way again, I will beat your Goddamn brains out." Aubrey took Rhonda and I out of the house, and we left until Rick passed out.

Linda heard Rhonda, Aubrey, and I talking about this so she knew it happened. I have been with Rick on and off for about five years. I did not mean to kill him, it just happened.

After reading the [petitioner's] statement into evidence, Agent Whitson said that he collected biological samples from each of the [petitioner's] fingers and from Suttles. In addition, he took a fake fingernail found in the hospital bathroom after the [petitioner] used it. Describing what he saw when he went to the [petitioner's] trailer, Agent Whitson said he noticed that the curtains were hung and that the victim's body was lying in a fetal defensive position. Agent Whitson also saw blood on the curtain side of the bed.

On cross-examination, Agent Whitson said he was dispatched around 10:30 to 11:00 p.m. on December 21, 2005. He said he arrived before the Violent Crime Response Team ("VCRT"). At the [petitioner's] house, Agent Whitson recovered a fingernail by the stove, a bloody rug, and a rag. He said that, when he spoke with Suttles, she told him she was intoxicated, and he said, "Yeah, you could tell she was on something." Agent Whitson said he found marijuana and pills, but he did not find any screwdrivers, nails, vibrators, or syringes. He also did not find a knife. He clarified his previous testimony that the [petitioner] returned to the CID of her own free will to give her second statement. Agent Whitson said he was "sure" the [petitioner] had been drinking and taking medication on the day he saw her. Agent Whitson stated that Suttles made two or three statements and that Robertson made two statements.

On redirect, Agent Whitson read the toxicology report into evidence, which reflected that the [petitioner] had diazepam and noradiazepam in her system. The victim did not have any drugs in his system.

Sergeant Robert Chadwell with the Claiborne County Sheriff's Department testified that he was on duty on December 21, 2005, and that he was dispatched to a domestic situation involving a knife. He arrived at Robertson's home and spoke with the [petitioner], who "seemed kind of hysterical." Sergeant Chadwell said the [petitioner] had cuts on her hand and "blood throughout her hair and face area." Suttles was also at the home, and she looked as if she had just showered. Sergeant Chadwell said the [petitioner] told him she was assaulted by the victim, who the [petitioner] said was "at his residence, possibly armed and intoxicated and maybe even passed out." Sergeant Chadwell then went to the victim's home, where the front door was open, but no one responded to Sergeant Chadwell's yelling. He saw blood throughout the carpeted areas. He also saw a large rottweiler dog, which ran to the kitchen when he entered the house. Sergeant Chadwell said there was a lot of blood in the bathroom, and he spotted a "bloody hammer and . . . screwdriver laying just before the [bedroom] door." Upon opening the door, Sergeant Chadwell saw the victim lying dead on the bed. Sergeant Chadwell said he never saw a knife.

On cross-examination, Sergeant Chadwell said he saw the cuts on the [petitioner's] right hand. He clarified that the other police officers told him that the [petitioner] said the victim assaulted her. Sergeant Chadwell stated that there was blood throughout the living area and into the hallway. He said it looked as if someone had tried to clean up certain spots of blood.

Agent Denise Morrissey with the TBI Crime Lab testified that she led the VCRT team in processing the crime scene. Because of the coldness and the darkness, they began by videotaping and photographing the scenes. They found the hammer and screwdriver on the floor in the [petitioner's] home; they found the screwdriver in the hallway. Agent Morrissey said that in the [petitioner's] home, she found a blue Adidas jacket on an armrest with Suttles's wallet inside the pocket. They also found size a XL blue sweatshirt with a white T-shirt tucked inside of it. Furthermore, VCRT found a smaller white T-shirt and a white sweatshirt with a purple bra, size 38C. Individual clothing items included a medium white T-shirt, a pair of size small women's underwear, a pair of size 7 jeans with a rust brown stain on them, and a pile of clothes on top of the washer and dryer. They also found a fake fingernail by a wood stove at the [petitioner's] house. Agent Morrissey described the bathroom by saying, "Upon looking inside the bathroom, there was a lot of -- a great amount of reddish brown stains that had the appearance of being swiped/wiped. There were also some blood drops on the toilet seat, and the

blood that was in the bathroom floor was pretty much almost covering the entire floor and there was also blood droppings on the cabinet and near the sink." She also said that there was an "empty cylindrical roll . . . completely void of whatever was rolled up on it and it was in the toilet. The toilet was also tinged pink as if blood were in - also in there . . . ." Agent Morrissey saw blood smears on the sink's rim, on doorknobs, and on the linoleum walkway in the house. She stated she also saw a cellophane cigarette wrapper with reddish brown stains on it. Agent Morrissey found fake fingernails by a chest of drawers and in the bedding. She said that one side of the bed did not have any blood on it.

Agent Morrissey stated that, when the VRCT processed the van, they found blood on the driver's and passenger's seats and blood spatters between the console. There were also "light smears" of blood on seat backs.

On cross-examination, Agent Morrissey testified that she knew a dog had been in the trailer before they processed the scene. She agreed that the dog could have "lapped up some of that blood." They also found a fake fingernail at Robertson's house and at the head of the victim's body in the bedroom.

Tammy Reagan, a deputy with the Claiborne County sheriff's office, testified that she met the [petitioner] while working at the jail on December 22, 2005. She said she took pictures of both the [petitioner] and Suttles in order to document any injuries. The [petitioner] had bruising, and her right hand was already bandaged. Deputy Reagan said the [petitioner] had a scratch on her right calf similar to "a briar scratch." She described the [petitioner] as "nervous" and "smoking a cigarette." Deputy Reagan did not remember any deep wounds or cuts on the [petitioner]. She said it was possible the [petitioner] had bruising around her breasts. She said that Suttles "had just a few little places on her hands."

Dr. Barry Stewart, the emergency room doctor at Claiborne County Hospital who treated the [petitioner], testified that the [petitioner] had "fairly mild" injuries on the inside of her right thumb. The [petitioner] told him that she was home alone when she was attacked by a stranger, and she mentioned that she engaged in sexual activity with two other people. Dr. Stewart said he could not find evidence that the [petitioner] was stabbed on her upper right leg, like she claimed. On cross-examination, Dr. Stewart described the [petitioner] as "excited" and possibly distraught. Later, he said she was "upset."

-10-

Registered Nurse Angela Lynn Taylor from the Claiborne County Emergency Room testified that she treated the [petitioner]. She said the [petitioner] had small superficial scratches, which did not explain how the [petitioner] was covered in blood. Nurse Taylor only cleaned the [petitioner's] right side, including her thumb. She said that the thumb injury did not require any stitches. Nurse Taylor said that she was initially told the [petitioner] had been involved in a domestic assault, so her notes originally described the wounds as defensive.

Dr. Sandra Elkins, a forensic pathologist and the medical examiner for Knox county, testified that she received the victim's body for an autopsy. She found two lacerations (tears in the skin indicative of blunt force) on the victim's forehead, one of which caused an underlying skull fracture; one superficial laceration in the right eyebrow area; one superficial laceration under the left eye; one laceration on the left side of the head, which caused an underlying skull fracture; one laceration in front of the lower part of the left ear; three lacerations on top of the head; and one laceration on the back of the head, which penetrated the skin down to the skull. Dr. Elkins also found superficial puncture wounds on the back of the victim's head. Discussing the victim's five chest wounds, Dr. Elkins stated: wound "A" entered the front of the victim's chest and completely cut the right internal jugular vein; wound "B" entered the upper chest and perforated the left lung and the heart, which caused bleeding into the sac surrounding the heart; wound "C" was in the front of the chest going downwards, and it cut the pulmonary artery at its origin from the heart and the pulmonic valve in the heart; wound "D" entered the left of the chest, and it ended in fat tissue that covers the sac around the heart; and wound "E" was also in the front left of the chest, and it hit the muscular tissue of the left chest wall. Dr. Elkins also found a "large gaping cut wound of his left arm near the elbow region." She also recovered a "pinkish red, fake fingernail . . . from the victim's right back of the armpit region."

Dr. Elkins concluded that there were at least three weapons used and that the victim would have died in five to ten minutes. She stated that there was evidence of a "minimum of seven to eight blows to the head" with the hammer and a "minimum of five . . . Phillips pattern type injuries to the scalp." The stab wounds on the chest and the wound on the elbow were consistent with knife wounds. "The cause of death was multiple, sharp force and blunt force injuries."

On cross-examination, Dr. Elkins said that the wounds could have been committed with more than three weapons and that she could not determine the

-11-

number of people wielding the weapons or determine the sequence of the wounds.

Michael Turberville, serologist with the TBI Nashville Crime Lab, testified that he determined the [petitioner's] and the victim's blood was on the claw hammer. The blood on the screwdriver matched the victim. Turberville said that the underside of the fingernail found on the floor of the bedroom had DNA evidence, but no blood, that matched the [petitioner] and Suttles. The swabs taken from the bathroom matched the [petitioner] and the victim's DNA. The swab taken from the front door of the neighbor' house matched the [petitioner], as well as the fingernail found at Robertson's house and the driver's seat in the van. Swabs from the left hand of the [petitioner] were a positive match for blood and DNA from the [petitioner], the victim, and Suttles, while swabs from the [petitioner's] right hand only matched the [petitioner]. The fingernail found on the emergency room bathroom floor had DNA from the [petitioner] and a partial profile of the victim; the fingernail on the back of the victim had the victim's DNA on it. On cross-examination, Turbeville acknowledged that only some of the evidence was tested for DNA profiling.

Hoyt Eugene Phillips, a latent fingerprint examiner with the TBI, testified that he analyzed the hammer and the indoor door handle of the [petitioner's] house. He could not get any prints "of value" from either piece of evidence.

Rhonda Drummonds, a neighbor of the [petitioner] and the victim in 2005, testified that she saw the [petitioner] and the victim together. Drummonds said she did not ever see the victim attack or assault the [petitioner]. She also denied that the victim had ever asked her to "suck his dick" or threatened the [petitioner] for telling him not to request such an act.

The Defense then presented Bill Davidson, a member of the Eighth Judicial District Drug Task Force, who was the first official to arrive on the scene on December 21, 2005. Davidson said that he first saw the van, which was pointed towards the dead end of the road, where Robertson lived. After making sure no one was in the van, he proceeded to Robertson's house, where Robertson, Suttles, and the [petitioner] waited on him. He interviewed Robertson, who gave him two official statements. The first statement was given around 11:13 p.m., and she gave the second statement at 6:30 a.m., which was after the police found the victim's body. Robertson told Davidson

-12-

that the victim and the [petitioner] "fuss[ed] and f[ou]ght all the time." She described the victim as "violent" when he drinks. She acknowledged that she had never seen marks on either of them. Robertson recalled that the [petitioner] and the victim fought two days before the night at issue.

Robertson then told Davidson that, on December 21, 2005, Suttles came to her house, and they talked for awhile. Then Suttles went to the [petitioner] and the victim's trailer. When Suttles returned to Robertson's house, she was "beating and hollering at [her] front door" and "[Suttles] had blood all over her hands and arms." Richardson said Suttles told her, "[G]et some help. [The victim] is stabbing [the petitioner]."

Davidson testified that in Robertson's second statement to him, she said the victim's "temper flare[d] up sometimes over nothing." She also said, the [petitioner] "came through [her] front door and fell down on the rug. The [Petitioner] said, 'I've stabbed [the victim].'" The [petitioner] also claimed to Robertson that she was "bleeding to death." Robertson said that the [petitioner] explained the situation by saying, "We were getting ready to have an orgy and Rick shows his damned ass."

On cross-examination, Davidson said that Robertson never specifically said the victim hit the [petitioner]. She also did not "indicate" to Davidson that she had seen the victim "become physically violent toward the [petitioner]." Davidson said that, when he talked with the [petitioner], he thought she was "extremely intoxicated" and that she kept saying that "she was drowning in her own blood," but he could not see any injury to her. Davidson said that, when Robertson gave him her second statement, she prefaced it with, "When I gave the statement to you earlier, I may have left out a few things. I'm telling you as I remember, I was really scared." Robertson also recounted in her second statement that the [petitioner] "said she had tried to get away in the van, but it quit on her and wouldn't run." The [petitioner] "kept wanting to run away" and asked Robertson to "help . . . get rid of the body." The [petitioner] also told Robertson that she "couldn't go to jail." Davidson then related that Robertson told him "If the [petitioner] finds out I told you this, she will kill me or burn me out. I get cold chills just thinking about it." Davidson said when he was at the CID the next morning, he saw the [petitioner] with her head resting on a desk while being interviewed by the TBI.

Aubrey Drummonds, the owner of the mobile home the [petitioner] and the victim rented, testified that he found a blue dildo on the bed in the mobile

-13-

home, half-way under a pillow. He said it was in plain view. He also found a straight razor under the couch in the living room when the [petitioner's] brother came to remove the furniture. Drummonds removed the bloody sheets and mattress and burned them.

On cross-examination, Drummonds said he saw the [petitioner] and victim together a lot, and he never saw any violent activity between the two. Drummonds testified that he disposed of the dildo. He said that he was cleaning up the trailer soon after the incident because he owned it and the court put him in charge of the [petitioner's] dog, which was still at the trailer.

The [petitioner] then showed the jury her right hand to let them see the wound to her thumb.

Charles Broughton, the [petitioner's] brother, testified that he had known the victim for fifteen to twenty years. He learned of the victim's death via television. Broughton testified that his sister has a disability. While he removed her furniture from the trailer, he found a bolt of a .22 single shot rifle under a couch cushion in the living room and the rifle itself in a small room off the living room.

The Defendant chose not to testify. . . .

*State v. Anita Kay Broughton*, No. E2007-02533-CCA-R3-CD, 2009 Tenn. Crim. App. LEXIS 194, *2-27 (Tenn. Crim. App., Mar. 13, 2009).

After hearing the above evidence presented at trial, the petitioner was convicted of first degree premeditated murder and sentenced to life with the possibility of parole. She filed a direct appeal with this court during which she challenged: (1) the sufficiency of the evidence of premeditation; (2) the trial court's decision to admit a DVD video of the crime scene; (3) the decision not to admit prior inconsistent statements of witnesses; and (4) the State's improper argument that the petitioner had previously raped one of the witnesses. After review, the judgment of the trial court was affirmed. Application for permission to appeal to the Tennessee Supreme Court was denied because it was filed one day past the deadline.

The petitioner next filed a pro se petition for post-conviction relief alleging, among other grounds, that she was denied her right to the effective assistance of counsel. Counsel was appointed, and an amended petition was filed. A hearing was held at which trial counsel, the petitioner, and the deputy criminal court clerk testified. After hearing the

-14-

evidence presented, the post-conviction court denied relief. The petitioner appealed, and this court reversed the decision and ordered that the petition be held in abeyance because the petitioner had been denied the opportunity to file her application for permission to appeal to the Tennessee Supreme Court because of the late-filing. After denial by our supreme court, the post-conviction court conducted a second evidentiary hearing on the matter at which an investigator who had assisted trial counsel testified. Also testifying was another attorney who was familiar with the case.

At the initial evidentiary hearing, the first witness called was Teresa Keck, the Claiborne County Criminal Court Deputy Clerk. She testified that the record in the case indicated that the State had the petitioner evaluated prior to trial, and it was determined that an insanity defense could not be supported and that the petitioner was competent to stand trial.

Trial counsel testified that he was appointed to represent the petitioner and that he filed several motions in the case. He noted that the suppression motion was heavily litigated and, further, that he requested and received funds for an investigator to aid in the case. Trial counsel acknowledged that he did not request funding for a psychological evaluation to be performed on the petitioner because one had been performed by the State while the case was in the general sessions court. In hind-sight, he believed that he should have had the petitioner evaluated for possible diminished capacity issues and should have filed notice that the defense might utilize any findings from that evaluation.

Trial counsel was asked to read into the record a portion of the transcript of the trial involving a conference between the trial court, the State, and himself. After the discovery deadline, trial counsel received notice of evidence that the State intended to utilize at trial, that being the testimony of a witness that the defendant had said she received a "crazy check" and that she could get away with murder. Trial counsel did not object to the fact that he was given notice of the evidence after the discovery deadline. As a result of that evidence, trial counsel obtained psychological records of the petitioner and social security records regarding her receiving the disability check. He asked the court to allow the records to be admitted despite the fact that he had not filed timely a Rule 12 notice of the intent to utilize a diminished capacity defense. Trial counsel testified that he had been aware previously of other mental records of the petitioner from the State's discovery. However, after discussion, he had chosen not to rely upon those records because they were a "double-edged sword." He stated that he felt that there was some danger in admitting those records so he had not filed notice of his intent to rely upon diminished capacity as a defense.

The trial court refused to allow admission of the records, stating that the rules were very clear and in effect for a reason. Trial counsel then asked the court on the record to declare him to be per se ineffective for failing to file the notice. At the post-conviction

hearing, he testified that, in retrospect, he should have asked that the "crazy check" statement not be admissible because it was discovered after the discovery deadline.

Additionally, trial counsel had made clear to the trial court that he was simply seeking admission of the voluminous records and would not be calling an expert to testify with regard to them. He indicated that he did have a doctor under subpoena; however, the doctor was out of the country at the time of trial. Trial counsel said that he had informed the doctor that it was alright to leave because he believed that the records themselves would be sufficient. He testified that he mistakenly believed that they would be admissible without expert testimony because competency was always at issue in a trial. The trial court noted that the records would not have been admissible without an expert to establish a causal connection between the mental issue and the crime.

Trial counsel testified that he did not raise the issue of the records on direct appeal because it involved his mistake, and he did not want to deprive the petitioner of a post-conviction. He also related that, after this court denied the petitioner's appeal, he filed a Rule 11 application for permission to appeal. However, it was denied as untimely because it was filed one day after the deadline.

On cross-examination, trial counsel testified that he had met with the petitioner several times and that, after much discussion, it was decided to vigorously pursue a theory of self-defense. While other defenses were considered, trial counsel stated that he believed self-defense was best based upon the evidence. He noted that he was aware of the petitioner's mental issues, but they chose not to pursue a diminished capacity defense because a lot of the information was not helpful to the case and was contradictory. He noted that:

> Some of the diagnoses presumed facts that I couldn't support with the rest of the record with testimony from other witnesses, and certain historical factual occurrences that I learned from say speaking with [the petitioner's] brother or with some other folks who had known her didn't square with what was in some of the psychological records.

Trial counsel did speak with Dr. Khanna, a doctor at a facility where the petitioner had received treatment, but they were unable to agree on a unified defense on that front for the petitioner. Nonetheless, trial counsel now believed that he should have filed Rule 12 notice so the records would have been admissable.

Trial counsel also noted that the records he had sought to have admitted dated back to 1989. He noted that the records did not deal in any way with the victim in this case, rather only with the petitioner's state of mind. He also testified that he believed that it would have

helped the petitioner's case if a jury had received a diminished capacity instruction, which was not given because of the lack of notice. He now thought that the defense would have mitigated the crime to a lesser-included offense conviction. Trial counsel testified that he did not agree with the jury's verdict.

The next witness to testify was the petitioner, who indicated that she was currently in therapy in prison and was seeing a psychiatrist every three weeks. She testified that prior to being charged in this case, she had mental issues including Tourettes, dramatic syndrome, and she heard voices. She had been prescribed medication for these issues. The petitioner stated that trial counsel was aware of these facts. She also testified that, with regard to the evaluation in the general sessions court, she only saw the doctor for a few minutes and was not asked much of anything.

On cross-examination, the State questioned the petitioner extensively about prior instances of mental treatment she had received. In a very confusing manner, the petitioner noted that she was unable to remember certain things she had told examiners or who she had seen on various occasions. She did acknowledge that she had previously been in Cherokee Mental Health and had given the staff differing accounts of what happened to her father and various other traumatic events in her life. She acknowledged that she had previously stabbed one man, but she denied that she had stabbed another. The petitioner also testified that she had discussed these issues with trial counsel, but "not in length." She did acknowledge that she had lots of drug and alcohol abuse problems.

After hearing the evidence, the post-conviction court denied relief, and the petitioner appealed. This court reversed the trial court because the petitioner had been denied her opportunity to file her application for permission to appeal to the Tennessee Supreme Court. The order of denial was vacated, and the post-conviction petition was to be held in abeyance pending a delayed direct appeal. The Tennessee Supreme Court eventually denied the application for permission to appeal, and the case was remanded to the post-conviction court.

Thereafter, a second evidentiary hearing was held in the matter. By the time of this hearing, trial counsel was deceased, but the post-conviction court noted specifically that it would also rely upon the evidence presented at the first hearing. The first witness to take the stand was Michael Cohan, a licensed private investigator who had been retained by trial counsel. Also assisting Mr. Cohan in the case was Kristen Zoradnik, who had a master's degree in social work. Mr. Cohan testified that he interviewed witnesses and reviewed the discovery in preparation for trial. After speaking with the petitioner, he told trial counsel that he was concerned about communication with her because he believed that she was severely limited and could not understand information.

-17-

Mr. Cohan also had Ms. Zoradnik interview the petitioner in order to evaluate her. He believed Ms. Zoradnik might be better equipped to make an evaluation because of her background and knowledge. Following her interview, Ms. Zoradnik wrote a memo which was sent to trial counsel. In the memo, Ms. Zoradnik stated that the petitioner appeared to have mental problems and a severely limited IQ. She recommended that the petitioner be tested further. However, the memo also noted that, after speaking with the petitioner's brother, Ms. Zoradnik acknowledged that the petitioner "seems to alter stories slightly to make her part in them bigger and more significant." Mr. Cohan testified that he was not aware that the petitioner had been evaluated for insanity and competency in the general sessions court.

The final witness to testify was Wesley Stone, a criminal defense attorney, who handled the Rule 11 application during the delayed appeal. Post-conviction counsel attempted to submit Mr. Stone as an expert, but the post-conviction court did not allow that. Mr. Stone testified that he was concerned that the mental health records were not admitted and that, had he conducted the representation, he would have defended the petitioner differently.

Mr. Stone testified that he had spoken with trial counsel before the petitioner's trial because he was also involved in a similar case at the same time. Trial counsel asked Mr. Stone how to get the records admitted. Trial counsel's intent was to simply get the records admitted and let the jury sort through them. Mr. Stone testified that, when he was asked by trial counsel about the records, there was not a doubt in his mind that the petitioner needed to be evaluated. He believed that, had this occurred, and a diminished capacity defense pursued, the petitioner would have been convicted only of a lesser offense. Mr. Stone testified that he could not recall if he had ever actually reviewed the records and admitted that he was familiar with them only in the context of them being used to support the petitioner's social security disability.

After considering the evidence presented at both hearings, the post-conviction court concluded that the petitioner had failed to establish her claim and denied relief. This appeal followed.

**Analysis**

On appeal, the petitioner challenges the post-conviction court's denial of her petition for relief. Specifically, she contends that trial counsel was ineffective in failing to pursue a defense of diminished capacity. The petitioner also contends that the post-conviction court erred by failing to prepare an order accurately reflecting the case facts and accurately apply the law. In order to obtain post-conviction relief, a petitioner must prove that his or her

conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103 (2010); *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner must prove allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

A criminal defendant has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and Article I, Section 9, of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. To prove ineffective assistance of counsel, a petitioner must prove both deficient performance and prejudice to the defense. *Strickland*, 466 U.S. at 687-88. Failure to satisfy either prong results in the denial of relief. *Id*. at 697.

For deficient performance, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms, despite a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 688-89. "In other words, the services rendered or the advice given must have been below 'the range of competence demanded of attorneys in criminal cases.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The petitioner must prove that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. When reviewing trial counsel's performance for deficiency, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). The reviewing court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). However, "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Prejudice in turn requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In *Strickland*, the Supreme Court noted that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. The court clarified that prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

A claim of ineffective assistance of counsel raises a mixed question of law and fact. *Burns*, 6 S.W.3d at 461; *Grindstaff*, 297 S.W.3d at 216. Consequently, this court reviews the trial court's factual findings de novo with a presumption of correctness, unless the evidence preponderates against the trial court's factual findings. *Grindstaff*, 297 S.W.3d at 216. But the trial court's conclusions of law on the claim are reviewed under a purely de novo standard with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

In its order denying relief, the post-conviction court made the following relevant findings:

> The petitioner fails to demonstrate that her attorney did not comply with the *Wilcoxson* standard. First, [trial counsel] did make some exploration of the petitioner's mental history by obtaining the petitioner's medical records. Further, [trial counsel] had possession of the results of a competency and mental condition evaluation, which reported that the petitioner was competent to stand trial and was able to appreciate the nature or wrongfulness of her acts at the time of the crime. Second, [trial counsel] testified that he discussed with the petitioner potential trial strategy. During these conversations, [trial counsel] and the petitioner also discussed her medical issues and records. [Trial counsel] stated that the records were "a double edged sword," and "perhaps not fruitful to introduce a lot of those records at trial" because they were contradictory. Even the petitioner, during this hearing, admitted to providing her medical health professionals with different accounts of what had happened throughout her life. Finally, [trial counsel] decided to vigorously pursue the defense of self-defense.

> Trial counsel for the petitioner passed away prior to the [second] hearing for post-conviction relief. Therefore, the petitioner attempted to

-20-

establish deficient performance on behalf of [trial counsel] by providing the testimony of another criminal defense attorney. Mr. Wesley Stone testified that, as a defense attorney, [trial counsel] should have submitted evidence of diminished mental capacity before the jury. This is precisely the type of issue that the *Strickland* court sought to avoid.

The decision to pursue self-defense rather than taking the defense approach of diminished mental capacity was purely tactical. As such, the decision was reserved to the petitioner and her counsel to determine prior to trial and should therefore not be scrutinized by attorneys in hindsight that may have conducted the petitioner's defense in another manner.

However, even assuming that the petitioner received ineffective assistance of counsel under the reasonableness standard, the petitioner has failed to meet her burden in proving that her attorney's deficient performance prejudiced the outcome of the case. This court acknowledges that Tennessee Code Annotated section 39-11-201 mandates that no person may be convicted of a crime unless the requiring culpable mental state is proven beyond a reasonable doubt. Although diminished capacity does not create a defense *per se*, the effect is that proof of diminished capacity may be used to negate an element of the crime charged. *See State v. Hall*, 958 S.W.2d 679, 689 (Tenn. 1997). However, the petitioner must show that "there must be a reasonable probability that but for counsel's unprofessional error, '*the result of the proceedings would have been different*,' not that it necessarily would have been different." *State v. Zimmerman*, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991) (internal citation omitted).

The petitioner relies on *Zimmerman's* conclusion that "[a] *reasonable* probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong the result of proceeding would have been different." *Id*. (emphasis added). However, her reliance is misguided. In *Zimmerman*, the court found defense counsel ineffective based on a cumulative effect of errors, including the failure to present evidence promised in opening statements, failure to call witnesses, and failure to call the defendant [to] testify as to her defense of self-defense. *See id*. at 228. In asserting that her doctor should have testified, the petitioner did not speculate as to her doctor's testimony. Rather, petitioner provided the court with the substance of the expected testimony had the doctor been called as a witness, allowing the court to determine that the jury could have found the petitioner guilty of a lesser charge. *Id*. at 226. Undoubtedly, "[t]he mere possibility of success based on

-21-

a defense for which there existed little or no evidentiary support is not enough to establish constitutionally inadequate counsel." *Wilcoxson*, 22 S.W.3d at 317.

In this case, the petitioner argues that had a doctor testified about her mental capacity at the time of the crime, there would be a reasonable probability that the result of the proceeding would have been different. Specifically, she asserts that she would have been found guilty of a lesser charge due to her diminished mental capacity. However, the petitioner leaps to this conclusion without adequately proving that a doctor would have established that the petitioner indeed had a diminished mental capacity. The petitioner has not identified any doctor that would testify as to her mental capacity at the time of the crime and has not described the substance of any such testimony. She merely speculates that a doctor would have testified that her mental capacity impacted her culpability to negate the premeditated element of first degree murder.

## I. Post-Conviction Court's Order

The petitioner contends that the post-conviction court erred by failing to give an order accurately reflecting the case facts and by failing to accurately apply the law. The petitioner argues that the court's order "did not accurately address the individual issues with specific findings of fact and law . . . pertaining to ineffective assistance of counsel. . . . The Petitioner . . . seriously questions the [post-conviction] court's findings as related to the accuracy of the given facts, and questions the [post-conviction] court's application of the law in [the order] in light of the extensive submitted evidence that contradicted" that order.

The petitioner first challenges the post-conviction court's finding that trial counsel "decided to vigorously pursue the defense of self-defense." She contends that fact is simply not accurate and is not supported by the extensive record. To support this conclusion, the petitioner relies upon the fact that trial counsel sought the advice of Mr. Stone shortly before trial on how to properly admit the petitioner's medical records at trial. She argues that the record establishes that trial counsel "was so frantic to admit the Petitioner's mental records at the pre-trial motion hearing and at trial to the effect that he requested twice that the trial court . . . declare his representation 'ineffective assistance of counsel.'" The petitioner states that this "conduct in the factual record does not reflect a lawyer who has abandoned a diminished mental capacity defense to 'vigorously pursue the defense of self-defense' as stated in the [post-conviction] court's order."

We disagree with the petitioner. In order to accept the petitioner's argument, we

would be forced to ignore the testimony of trial counsel at the first post-conviction hearing that "[w]e pursued the defense of self-defense vigorously and unfortunately, it did not work with the Jury." Based upon its findings, the post-conviction court obviously accredited this statement by trial counsel. It is not the policy of this court to reevaluate credibility determinations made by the post-conviction court. *See Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). While trial counsel acknowledged considering other possible defenses to pursue, including diminished mental capacity, it was self-defense which was ultimately presented. Trial counsel gave testimony that the petitioner's mental health records were a "double edged sword," which may ultimately have affected the decision. Regardless, the petitioner is incorrect in asserting that the record does not support this finding.

The petitioner also asserts that the post-conviction court erred in concluding that the testimony of Mr. Stone, that being that trial counsel should have submitted evidence of the petitioner's diminished capacity, was the type of "second guessing" prohibited by *Strickland*. The petitioner argues that Mr. Stone was a fact witness with knowledge of the case because trial counsel sought advice from Mr. Stone on the subject. She asserts that Mr. Stone was "not speculating as to the tactical decision of [trial counsel] cited in the trial court's order, but he was testifying as to the advice that he gave. . . ."

We do agree with the petitioner, as did the post-conviction court, that Mr. Stone was a fact witness with some knowledge of relevant issues. However, we cannot conclude such with regard to the statement that trial counsel should have submitted evidence of the petitioner's diminished capacity. What he told trial counsel or any advice he gave is factual testimony, what defense should have been pursued is second guessing tactical decisions. Moreover, as noted by the State, Mr. Stone's knowledge of the actual contents of the records was limited.

Third, the petitioner asserts that the post-conviction court's analysis "is fatally flawed and wrong due to finding that trial counsel's alleged 'tactical self-defense' defense was against the weight of the evidence in the trial record." She contends that the entire statement of facts is contrary to the finding that the defense decision was purely tactical. To support her argument, she states that if the finding were true, then trial counsel would not have: (1) spent time discussing the diminished mental capacity defense with the trial court; (2) would not have a subpoenaed a doctor to testify as to the mental condition of his client; (3) would not have argued admissibility of the records; and (4) would not have requested that the court find him ineffective.

Again, we disagree with the conclusion, as it based upon speculation. We cannot speculate as to the inner working of trial counsel's decision making process. On the record, he testified that after speaking with the petitioner and reviewing possible defenses, they

chose to pursue a defense of self-defense. That attempts were made to include mental records at a later date does not negate that decision. As pointed out by the State, the evidence against the petitioner, including her own statements to the police, all but forced trial counsel to choose a self-defense defense at trial.

Lastly, the petitioner argues that the court erred in finding that her assertion of prejudice was speculative because of a lack of proof that a diminished capacity defense could be established, *i.e.* no doctor testified that the defense was viable based upon the petitioner's mental condition. She contends that she met her burden of showing a reasonable probability that she would have been found guilty of a lesser offense through the testimony of trial counsel and Mr. Stone, who both testified that they believed that presenting a diminished capacity defense would have resulted in a conviction for a lesser offense. She argues that the testimony of a doctor was not required.

Again, we cannot accept the petitioner's argument that the post-conviction court erred in its conclusion. The testimony of the attorneys is simply that, in their opinion, the petitioner showed signs of a mental illness and needed further diagnosis. They offered no proof as to what the conditions affecting the petitioner were or how they related to the crime committed. Based upon their observation, they believed the verdict might have been different. However, that is mere speculation.

The petitioner appears to be operating on the premise that establishment of the actual mental illness or defect is not required. However, as the post-conviction court found, that is the basic first step which must be established. An attorney's testimony as to his opinion is not sufficient evidence of a mental disease or defect. While a doctor's testimony may not be required to establish the existence of this, some medical proof would be, *i.e.* certified records. Additionally, causal connection is also required. The record here is void of sufficient proof to establish either in this case. The only proof is second-hand testimony that the petitioner sought mental health treatment at some point and was afforded a social security disability check. As noted by the State, nothing in the record establishes that the petitioner was completely unable to formulate the intent required to murder the victim.

After reviewing the petitioner's complaints with regard to the post-conviction court's order, we conclude no error is present. As such, the petitioner is entitled to no relief on this issue.

## II. Ineffective Assistance of Counsel

The petitioner also asserts that it was error to deny her petition because trial counsel was deficient for "not develop[ing] a viable defense concerning her mental illness which

-24-

would have been a major mitigating factor in the charge of first degree murder." In that same vein, she further asserts deficient performance in that trial counsel did not give timely notice under Tenn. R. Crim. P. 12, which precluded admission of medical records, and did not have the petitioner undergo a mental evaluation despite knowledge that problems were present. In support of the prejudice prong, the petitioner contends that trial counsel's action "did prejudice her case due to the fact that she may have been acquitted or convicted of a lesser included crime by a reasonable jury if her diminished mental capacity or disease defense had been presented to the Court."

The petitioner contends that the record establishes that trial counsel knew and/or should have known that he was required to give notice pursuant to Rule 12 and to secure a mental health professional to properly admit the petitioner's records into evidence. The petitioner acknowledges that the trial court's refusal to admit the records was proper based upon trial counsel's actions. At a minimum, the petitioner faults trial counsel for not seeking a continuance to allow for better preparation. The petitioner also relies upon trial counsel's own admission that he considered his actions to constitute ineffective assistance of counsel. In summation, the petitioner contends that trial counsel's deficient performance was evidenced by the facts that: (1) he had personal knowledge of the petitioner's long history of mental illnesses; (2) he failed to develop a defense of diminished capacity by securing an expert for testimony at trial; (3) he failed to file a Rule 12 notice with the State; (4) he failed to submit admissible evidence of the petitioner's mental issues through proper procedures; (5) he failed to develop the diminished capacity defense, which precluded submission of major mitigating factors; and (6) he failed to request a continuance to develop the defense despite being advised to do so by Mr. Stone. She claims that these deficiencies resulted in prejudice to her case by precluding conviction for a lesser included offense or mitigation of her life sentence.

Following review of the record, we conclude that the evidence does not preponderate against the findings made by the post-conviction court. The issue is essentially whether trial counsel was deficient for failing to pursue a diminished capacity defense. The petitioner's complaints of failure to file notice, have an evaluation, or seek a continuance are clearly not deficient if an informed tactical decision had been made to pursue a theory of self-defense. Despite the fact that trial counsel later stated that he was ineffective and should have pursued a diminished capacity defense, as the State points out, deficient performance is shown if counsel's conduct fell below an *objective* standard of reasonableness under prevailing professional norms. *See Strickland*, 466 U.S. at 688. Thus, the question which must be answered is whether the decision to not pursue the defense was reasonable under our norms.

Trial counsel gave specific testimony at the hearing that he had met with the petitioner, and they had a discussion of possible defenses. Trial counsel was aware of

possible mental issues during those discussions. Moreover, he was aware that the petitioner had recently been evaluated and found to be competent and to understand the nature of her actions. Trial counsel testified that the records which he had were contradictory and could be harmful if admitted at trial. Although not addressed by trial counsel during his testimony, the memorandum introduced by the investigator at the second post-conviction hearing also noted that petitioner was very inconsistent in her statement of the facts. Trial counsel also testified that he did speak with a mental health expert briefly and that they were not able to reach an agreement about a mental health defense. Moreover, he was faced with the statements given by the petitioner to the police which strongly supported a theory of self-defense. In the statements, the petitioner gave very detailed information about the murder and its circumstances. Based upon this information, we cannot conclude that trial counsel was deficient for not pursuing a theory of diminished capacity. While trial counsel may have in hindsight regretted his actions or changed his mind, the decision he made was an objectively reasonable one at the time. Moreover, trial counsel did get in some references to mental illness through the reading of the petitioner's statements and by questioning her brother, as well as the reference that she received a "crazy check."

Regardless, the petitioner has failed to establish that she was prejudiced by the failure to pursue a diminished capacity defense. To establish a claim of diminished capacity requires a showing that the defendant was completely unable to form the requisite intent due to mental disease or defect. *State v. Hall*, 958 S.W.3d 679, 691 (Tenn. 1997). As previously noted, the petitioner has failed to establish that in her case. While the record references vague mental issues over the years and diagnosis of various mental disorders, there are no supporting documents to establish that. The records which the petitioner faults trial counsel for failing to get admitted are not before this court. To afford the petitioner relief on this record would be pure speculation.

Additionally, even were the records before us, the petitioner has still failed to establish a causal link as to how that mental disease or defect precluded the petitioner from forming the requisite intent on the evening of the murder. No mental evaluation was performed for post-conviction purposes; thus, the petitioner has failed to establish that the defense would have been viable if pursued. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Absent such a showing, the petitioner is precluded from establishing prejudice.

## CONCLUSION

Based upon the foregoing, the denial of post-conviction relief is affirmed.

-26-

_____

JOHN EVERETT WILLIAMS, JUDGE